**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number:  2013-NMSC-023**

**Filing Date:  June 3, 2013**

**Docket No. 33,627**

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT,**

              **Plaintiff-Respondent,**

**v.**

**BARNESANDNOBLE.COM LLC,**

              **Defendant-Petitioner.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Monica M. Ontiveros, Administrative Hearing Officer**

Brann & Isaacson
George S. Isaacson
David W. Bertoni
Lewiston, ME

Brownstein, Hyatt, Farber, Schreck, L.L.P.
Timothy R. Van Valen
Albuquerque, NM

for Petitioner

Gary K. King, Attorney General
Tonya Noonan Herring, Special Assistant Attorney General
Santa Fe, NM

for Respondent

Shirley K. Sicilian
Sheldon H. Laskin
Washington, DC

Bruce J. Fort

1

Santa Fe, NM

for Amicus Curiae
Multistate Tax Commission

Sutherland, Asbill & Brennan, L.L.P.
F. Barry McCabe
Atlanta, GA

Jeffrey A. Friedman
Michele Borens
Washington, DC

for Amicus Curiae
Amazon.com, Inc.

**OPINION**

**CHÁVEZ, Justice.**

**{1}** This case presents the question of whether an out-of-state internet retailer, Barnesandnoble.com LLC (bn.com), which has no physical presence in New Mexico other than through stores owned by a sister corporation, Barnes & Noble Booksellers, Inc. (Booksellers), is subject to New Mexico gross receipts tax on its sales to New Mexico residents without offending the federal Commerce Clause. The answer to this question depends on whether Booksellers engaged in activities in this state on behalf of bn.com that were significantly associated with bn.com's ability to establish and maintain a market for its sales in New Mexico, thus creating a substantial nexus between bn.com and New Mexico. We conclude that Booksellers did engage in such activities, which include (1) Booksellers' promotion of bn.com through sales of gift cards redeemable at bn.com and bearing bn.com's name, (2) Booksellers' policy of sharing customers' email addresses with bn.com, (3) Booksellers' implicit endorsement of bn.com through the companies' shared loyalty program and Booksellers' return policy, and (4) Booksellers' in-state use of Barnes & Noble logos and trademarks, which bn.com also used. Therefore, we hold that Booksellers' in-state activities were sufficient to create a substantial nexus between bn.com and the State of New Mexico, so that the state may tax bn.com's sales to customers in New Mexico without offending the federal Commerce Clause.

**BACKGROUND**

**{2}** The facts of this case are not in dispute. Bn.com is a Delaware corporation that sells books, movies, and other media over the internet. In 2006, the New Mexico Taxation and Revenue Department (the Department) assessed gross receipts tax against bn.com on its sales to New Mexico residents during a period from January 1998 through July 2005. *See* NMSA

2

1978, §§ 7-9-1 to -114 (1966, as amended through 2012) (the Gross Receipts and Compensating Tax Act). Bn.com protested the assessment, and a hearing officer granted summary judgment to bn.com, finding that it lacked a substantial nexus with the State of New Mexico, and therefore it could not constitutionally be required to pay the tax. The Department appealed, and the Court of Appeals held that bn.com had a substantial nexus with the state because of its use of Barnes & Noble trademarks and cross-marketing activities with Booksellers' stores. *N.M. Taxation & Revenue Dep't v. Barnesandnoble.com LLC* (*In re Barnesandnoble.com LLC*), 2012-NMCA-063, ¶¶ 34-35, 283 P.3d 298. We granted certiorari and now affirm. Although we agree with the holding of the Court of Appeals, we emphasize that our holding does not rest exclusively on bn.com's use of Barnes & Noble trademarks; we conclude that there are several additional reasons to hold that bn.com had a substantial nexus with the State of New Mexico.

## DISCUSSION

{3} The parties agree that this appeal concerns the application of the law to the undisputed facts, and therefore the standard of review is de novo. *Sonic Indus. v. State*, 2006-NMSC-038, ¶ 7, 140 N.M. 212, 141 P.3d 1266.

{4} The federal constitutional issue in this case stems from the Commerce Clause, which authorizes Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause has been interpreted not only as an affirmative grant of power to Congress, but also as a limitation on state actions that interfere with interstate commerce. *Quill Corp. v. N.D. ex rel. Heitkamp*, 504 U.S. 298, 309 (1992). In this form, it is known as "the 'negative' or 'dormant' Commerce Clause." *Id.* State taxation of interstate commerce may impose burdens that violate the dormant Commerce Clause. *Id.*

{5} In the absence of specific federal authorization, the Commerce Clause allows a state to tax an actor in interstate commerce "when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). Of these requirements, the only issue in this case is in the substantial nexus. If bn.com's actual sales have a substantial nexus with New Mexico, New Mexico may constitutionally tax those sales.

{6} A vendor that has a physical presence in the taxing state has a substantial nexus with the state. *Quill Corp.*, 504 U.S. at 315, 317-18. The key distinction is "between mail-order sellers with [a physical presence in the taxing] State and those . . . who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business." *Id.* at 311 (alterations in original) (quoting *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 559 (1977) (internal quotation marks omitted)). The facts in *Quill Corp.* concern a vendor that did not have a physical presence in the taxing state of North Dakota and *Quill Corp.* sold its products by mail; it had no offices, employees, or significant property in North Dakota. 504 U.S. at 302. Therefore, the U.S. Supreme Court

held that the company lacked a substantial nexus with North Dakota, and North Dakota could not require the company to pay a use tax to the state on its sales. *Id.* at 301-02. The Court explained that there is a "safe harbor for vendors 'whose only connection with customers in the [taxing] State is by common carrier or the United States mail' . . . [and] such vendors are free from state-imposed duties to collect sales and use taxes." *Id.* at 315 (first alteration in original) (quoting *Nat'l Bellas Hess, Inc. v. Dep't of Revenue of Ill.*, 386 U.S. 753, 758 (1967), *overruled on other grounds by Quill Corp.*, 504 U.S. at 306-08).

**{7}** In this case, the parties agree that bn.com itself has no employees or property in New Mexico, but that is not the end of our inquiry. The U.S. Supreme Court has consistently taken a functional approach to the substantial nexus analysis, and it has been willing to find a substantial nexus even where the business in question had neither property nor regular employees in the taxing state. In *Scripto, Inc. v. Carson*, 362 U.S. 207, 208-09, 211 (1960), the Court rejected a business's argument that it had no substantial nexus with Florida because it had no full-time employees in the state. The business had contracted with ten independent "wholesalers or jobbers" in Florida to solicit orders on its behalf. *Id.* at 209. The Court held that the designation of the agents as independent contractors, rather than employees, was "without constitutional significance," and what mattered was "the nature and extent" of the taxpayer's business in the state. *Id.* at 211-12.

**{8}** The Supreme Court reaffirmed and expanded *Scripto* in *Tyler Pipe Industries, Inc. v. Washington State Dep't of Revenue*, 483 U.S. 232 (1987) (*Tyler Pipe U.S.*). In *Tyler Pipe U.S.*, an out-of-state manufacturer challenged the authority of the State of Washington to impose a tax on its sales within the state. 483 U.S. at 234. The manufacturer "maintain[ed] no office, own[ed] no property, and ha[d] no employees residing in the State of Washington." *Id.* at 249. However, the manufacturer hired sales representatives within the state who called on customers, solicited orders, and "maintain[ed] and improve[d] the [manufacturer's] name recognition, market share, goodwill, and individual customer relations" in Washington. *Id.* (quoting *Tyler Pipe Indus., Inc. v. State, Dep't of Revenue*, 715 P.2d 123, 127 (Wash. 1986) (*Tyler Pipe Wash.*) (en banc) (internal quotation marks omitted), *holding modified on other grounds by Digital Equip. Corp. v. State, Dep't of Revenue*, 916 P.2d 933, 941 (Wash. 1996) (en banc)). The U.S. Supreme Court held that even though the manufacturer formally had no property or employees within the state, the sales representatives' in-state activities created a nexus sufficient to allow the state to tax the manufacturer. *Tyler Pipe U.S.*, 483 U.S. at 249-51. The Court held that "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *Id.* at 250 (quoting *Tyler Pipe Wash.*, 715 P.2d at 126 (internal quotation marks omitted)). Therefore, the question in this case is whether Booksellers performed activities on behalf of bn.com that are significantly associated with bn.com's ability to establish and maintain a market for its sales in New Mexico.

**{9}** Although bn.com had no property in New Mexico, Booksellers performed activities in New Mexico for bn.com's benefit. Booksellers operated three stores in New Mexico

4

during the audit period. Bn.com and Booksellers are separate corporations, but they share a parent company, Barnes & Noble, Inc., which owned 100% of Booksellers and between 40% and 100% of bn.com throughout the audit period. During the audit period, Booksellers displayed bn.com's web address on gift cards (usable at either Booksellers or bn.com) that they sold in stores during part of the audit period, providing bn.com with advertising. Booksellers sold memberships in a loyalty program that also gave customers a discount at bn.com, and Booksellers shared customers' email addresses with bn.com.

**{10}** In addition, bn.com and Booksellers both used Barnes & Noble trademarks. A reasonable inference is that consumers would likely have thought of the two corporations as one company. Because of customers' association of Booksellers with bn.com, bn.com benefitted from brand loyalty established by local branches of Booksellers. Bn.com's parent company recognized the benefits of such customer associations in a filing with the Securities and Exchange Commission during the audit period, in which it wrote that "the Barnes & Noble trade name . . . is a strong motivating factor in attracting customers, especially with regard to the post-early adopter market of consumers who have yet to make an online purchase." The Court of Appeals observed that "Booksellers' customers had no way of knowing . . . that different corporate entities represented the goodwill of . . . Barnes & Noble trademarks on the internet and in physical stores. In fact, consumers saw only one entity: Barnes & Noble." *In re Barnesandnoble.com LLC*, 2012-NMCA-063, ¶ 33 (internal quotation marks and citation omitted). By using the name "Barnes & Noble" and other Barnes & Noble trademarks, bn.com benefitted from the goodwill associated with Booksellers. We therefore hold that Booksellers' in-state activities assisted bn.com's efforts to establish and maintain a market in New Mexico.

**{11}** The California Court of Appeal applied similar logic in *Borders Online, LLC v. State Board of Equalization*, 29 Cal. Rptr. 3d 176, 178, 186 (Ct. App. 2005), to hold that California could tax sales by Borders Online because of its affiliation with brick-and-mortar Borders stores in the state. Borders Online and Borders, Inc., which owned Borders stores, were separate corporations, *id.* at 178-79, as bn.com and Booksellers are in this case. Some Borders stores advertised Borders Online on their receipts. *Id.* at 179. Borders Online's website contained links to the website for Borders stores, which included a list of store locations. *Id.* Like bn.com and Booksellers, Borders and Borders Online shared some market data and used similar logos. *Id.*

**{12}** We note briefly that Borders and Borders Online were wholly owned subsidiaries of the same parent, *id.*, while Booksellers and bn.com shared only partial ownership during much of the audit period. However, the case law does not require the in-state actor to have any particular relationship to the out-of-state taxpayer, so long as the in-state actor engages in activities on behalf of the taxpayer. *See Tyler Pipe U.S.*, 483 U.S. at 250 (holding that nexus determination was unaffected by local representatives' status as employees or independent contractors, and that the proper inquiry focused on the activities performed in the state on behalf of the taxpayer). For this reason, we conclude that ownership of the corporations is not dispositive of the substantial nexus inquiry.

5

**{13}** The New Mexico Court of Appeals distinguished *Borders Online, LLC* because, unlike Booksellers, Borders store policies treated Borders Online customers preferentially. *In re Barnesandnoble.com LLC*, 2012-NMCA-063, ¶¶ 20-21. Borders stores gave refunds for purchases from Borders stores or Borders Online, but gave only store credit for returns from competitors. *Borders Online, LLC*, 29 Cal. Rptr. 3d at 179-80. In contrast, during the audit period in this case, Booksellers issued refunds only for items purchased from Booksellers; it would accept returns from other retailers, including bn.com, in exchange for store credit. On that basis, the Court of Appeals determined that "Booksellers' return policy did not give preference to [bn.com]," and therefore *Borders* was inapplicable. *In re Barnesandnoble.com LLC*, 2012-NMCA-063, ¶¶ 20-21.

**{14}** Despite the differences in the stores' formal return policies, we conclude that bn.com received a benefit from Booksellers' return policy similar to the benefit Borders Online received from Borders stores' return policy. Even though Booksellers accepted returns of purchases from bn.com on the same basis as returns from its competitors, bn.com advertised its return policy to customers as follows: "You can return your online purchases of most products to us for a full refund or to any Barnes & Noble Store for an in-store credit." Near its "Easy Returns" link, bn.com also provided a link to a Booksellers store locator. Customers visiting bn.com's website would likely have seen the ability to return items to Booksellers' stores as a benefit of purchasing from bn.com. Nothing on the site suggests that customers could return purchases from Amazon.com or any other bn.com competitor on identical terms, even though that was apparently the case.

**{15}** In *Borders Online, LLC*, the California Court of Appeal held that easy returns "undoubtedly made purchasing merchandise on [the Borders Online] website more attractive to California customers, as they would know that returning or exchanging any unwanted items would be far simpler than if they purchased items from an e-commerce retailer with no presence in California." 29 Cal. Rptr. 3d at 186. The court noted that at least some customers would not place orders online without a solid return policy, and Borders Online's offer of "convenient returns and exchanges at nearby reputable brick-and-mortar stores . . . would assuredly help promote [customers'] confidence." *Id.* (internal quotation marks and citation omitted). The essential issue in *Borders Online, LLC* was the effect that Borders Online's affiliation with Borders stores would have on potential customers, and its reasoning is equally applicable here. New Mexico customers who lived near a Booksellers location and preferred to return items in person would have thought it in their interest to order from bn.com rather than a different online retailer.

**{16}** We recognize that courts in several states have reached a different conclusion, holding that the presence of affiliated brick-and-mortar stores in a state does not create a nexus that would allow the state to tax catalogue or online sales. *See SFA Folio Collections, Inc. v. Bannon*, 585 A.2d 666, 668 (Conn. 1991) (refusing to impute in-state presence of Saks Fifth Avenue stores to affiliated SFA Folio catalogue corporation); *SFA Folio Collections, Inc. v. Tracy*, 652 N.E.2d 693, 695, 698 (court's fact description outside body of opinion) (Ohio 1995) (per curiam) (same); *Bloomingdale's By Mail, Ltd. v.*

*Commonwealth, Dep't of Revenue*, 567 A.2d 773, 778-79 (Pa. Commw. Ct. 1989) (refusing to impute activities of Bloomingdale's stores to Bloomingdale's by Mail catalogue sales). However, we must follow the standard set forth by the U.S. Supreme Court in *Tyler Pipe U.S.*, 483 U.S. at 250. *Bannon*, *Tracy*, and *Bloomingdale's* do not cite *Tyler Pipe U.S.* or attempt to apply its rule. *See generally Bannon*, 585 A.2d 666; *Tracy*, 652 N.E.2d 693; *Bloomingdale's*, 567 A.2d 773.

**{17}** We also recognize that one federal district court considered a case almost identical to this one and found no substantial nexus. *St. Tammany Parish Tax Collector v. Barnesandnoble.com*, 481 F. Supp. 2d 575, 582 (E.D. La. 2007). That court seems to have imposed a standard higher than that required by *Tyler Pipe U.S.*—for example, by examining whether Booksellers "solicited orders on behalf of" bn.com or produced revenue for bn.com. *St. Tammany Parish*, 481 F. Supp. 2d at 581. *Tyler Pipe U.S.* does not require Booksellers to act as sales agents for bn.com; it requires only that activities performed on bn.com's behalf be "significantly associated with [bn.com's] ability to establish and maintain a market" in New Mexico. 483 U.S. at 250 (quoting *Tyler Pipe Wash.*, 715 P.2d at 126 (internal quotation marks omitted)). Booksellers and bn.com presented a single face to the public, so we may infer that Booksellers' New Mexico locations developed name recognition and loyalty for bn.com. Booksellers sold gift cards that encouraged customers to shop at bn.com, and bn.com advertised its connections to Booksellers by offering a store locator and by promoting its return policy. Bn.com and Booksellers also shared customer data. None of bn.com's online competitors received these benefits. We conclude that Booksellers' presence and activities in New Mexico gave bn.com an advantage over its competitors, which helped bn.com establish and maintain a market in this state.

**CONCLUSION**

**{18}** Because Booksellers' activities in New Mexico were significantly associated with bn.com's ability to establish and maintain a market here, bn.com had a substantial nexus with the State of New Mexico. Therefore, New Mexico may collect gross receipts tax on bn.com's sales in the state without offending the Commerce Clause of the United States Constitution. We affirm the opinion of the Court of Appeals and remand for further proceedings consistent with this opinion.

**{19} IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**


_____
**CHARLES W. DANIELS, Justice**


_____
**BARBARA J. VIGIL, Justice**

**Topic Index for** _N.M. Taxation & Revenue Dep't v. Barnesandnoble.com, L.L.C._**, No. 33,627**

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Appeal
 Rules

**COMMERCIAL LAW**
Trademarks and Copyright

**CONSTITUTIONAL LAW**
Commerce Clause
Due Process

**TAXATION**
Gross Receipts Tax
Substantial Nexus